**ELCARRIERS, INC., as Owners of the S/S BENDITA, Libelant,**

v.

**Maris EMBIRICOS and THE M/V PETALI, her engines, etc., Respondents.**

**Maris EMBIRICOS, as Owner of the M/V Petali, Cross-Libelant,**

v.

**THE S/S BENDITA, her engines, boilers, etc. and Elcarriers, Inc., Cross-Respondents.**

United States District Court
S. D. New York.

June 4, 1959.

Zock, Petrie, Sheneman & Reid, New York City, proctors for libelant and cross-respondents, Anthony N. Zock, James D. Hanlon, New York City, advocates.

Nelson, Healy, Baillie & Burke, New York City, proctors for respondents and cross-libelant, Nicholas J. Healy 3rd, and Thomas A. Dillon, Jr., New York City, advocates.

DAWSON, District Judge.

These are two suits in admiralty which were consolidated for trial. The first suit is that of Elcarriers, Inc., as owner of the Liberian Flag vessel Bendita, against the M/V Petali, and her owner Maris Embiricos. The second suit is that of Maris Embiricos, as owner of the Greek Flag vessel M/V Petali against the S/S Bendita and her owner, Elcarriers, Inc.

### The Facts

The actions arose out of the collision between the S/S Bendita and the M/V Petali, shortly after 4:00 a. m., on March 30, 1957. The collision occurred in the Houston Ship Channel, an inland waterway in Texas. The channel is approximately 400 feet wide in the area where the collision occurred.

At the time of the collision visibility was 5 to 6 miles and the night was dark, without a moon. There was a slight breeze and the tide was flooding.

The Bendita, a Liberty type vessel, 441 feet in length and 58 feet in breadth, was proceeding northbound from the sea to Houston, and was being navigated by Captain Thomas N. Lightsey, Jr., who was then a Deputy Pilot of the Houston Pilots Association, having completed seven months of the one year probationary period which he was required to complete before becoming a full-fledged member of the Pilots Association. She had no ballast or cargo on board.

The Petali was a Greek ship of the Knot type, 338 feet in length and 50 feet in breadth. At the time of the collision she was being navigated by Captain Arthur Borup, a fully qualified member of the Houston Pilots Association who had received his Texas State Pilot's License in 1950.

The Bendita was proceeding inbound up the channel from Galveston to Houston, while the Petali was proceeding outbound from Houston to Galveston. The pilots of each ship saw the other ship at a distance of approximately five miles.

When the vessels were approximately 0.7 mile to one mile apart, the Bendita sounded a passing signal of one short blast; this whistle was heard on board the Petali and was answered by one short blast.

The ships continued on their course in an approximately "head to head" situation. When the vessels were approximately one-half mile from each other a second one short blast signal was given by the Bendita; this signal was heard on the Petali and answered with a like signal. While the pilot of the Bendita claimed that he did not hear any answering signals from the Petali, the evidence was such as to convince the Court that the Petali did answer these respective signals and that if they were not heard by the pilot of the Bendita it was due either to inattention on his part or as a result of a defect in hearing from which he had suffered and which, he admitted, had resulted from an accident of which he had been the victim sometime previously.

The one blast signals given and returned indicated that the ships intended to make a port to port passing. The Ben-

dita continued on its course at a speed of approximately 12 knots per hour, without reducing speed; the Petali continued for some time on its course at a speed of approximately 10 knots per hour. At the time the signals were given both vessels were proceeding approximately on the center line of the channel. However, when the first one blast signal was given by the Bendita she turned slightly to starboard, as did the Petali at the time she responded to the one blast signal. Up to this time both ships had complied with the proper rules governing navigation in inland waterways and had indicated that they were about to proceed on a port to port passing. However, the fact that the Bendita did not reduce its speed, but continued full speed ahead, indicated a failure on her part to comply with those provisions of the inland rules requiring ships which are about to pass each other to reduce speed. The rules provide that the maximum speed for all steam vessels in this part of the Houston Ship Channel shall not exceed 8 miles per hour and that "all craft passing other boats, barges, scows, etc., in motion, moored or anchored, shall slow down. * * *" Rules and Regulations to Govern the Use, Administration and Navigation of the Houston Ship Channel, Texas, Rules 1 and 3, promulgated by the Secretary of War pursuant to statutory authority conferred by the Rivers and Harbors Act, 40 Stat. 250, § 4.

It was the events of the next few minutes that caused the collision and gave rise to the facts from which the Court must determine the issue of liability.

The pilot of the Bendita contended that he saw the Petali veer to her port when the ships were still about half a mile apart. There was no proof that any change in direction was taken by the Petali, other than this unsupported statement. In any event the pilot of the

Bendita at that time became somewhat "panicky" feeling that if the Bendita continued on its course, with the Petali proceeding to port and to the east side of the channel, the ships would collide. The pilot of the Bendita thereupon sounded a danger signal of four short blasts, and almost immediately thereafter sounded a two blast signal, indicating a willingness to pass starboard to starboard. The Petali did not answer either the danger signal or the two blast signal. The Bendita, however, after having given the two blast signal, and without waiting for a response from the Petali, changed course sharply to her left and continued full speed ahead. As a result the Bendita proceeded over to the side of the channel which was the proper side of the channel for the Petali to follow and cut across the bow of the Petali. The Petali, which had not answered the two blast signal, continued on her course and ran into the Bendita on the west side of the channel adjacent to Buoy 37 which marked the edge of the west side of the channel. Thus the collision occurred on the extreme westerly edge of the channel, i. e., on the Petali's right-hand side of the channel as she was proceeding southbound, and on the Bendita's lefthand side of the channel as she was proceeding northbound. The Petali's bow struck the Bendita's starboard side in the vicinity of the No. 1 hatch at a collision angle of approximately 25°. The collision occurred on the west side of the channel, but the force of the impact caused the vessels to veer further toward the west until they were almost on the beach.

When the Bendita gave her signals of one short blast on two occasions, which were responded to by the Petali's like signals, this was some indication that the ships had agreed to pass port to port. If each had proceeded on its own side of the channel they could have passed without collision.* The Court accepts

---

* The testimony of the pilot of the Bendita was quite revealing. He testified at page 76, et seq.:

"Q. You were trying to get over to the left side of the channel. A. That is correct.

the testimony of the pilot of the Petali that she continued on her starboard side of the channel and did not veer to the east side of the channel. There was no reason why, having entered into an agreement to pass port to port, the pilot of the Petali would swing his vessel over to the east side of the channel; nor, if he had been proceeding toward the east side of the channel, is it consistent that the collision, when it occurred, would be on the west side of the channel and practically at the edge of the westerly side of the channel.

 The Court concludes that the pilot of the Bendita was not as experienced as the pilot of the Petali, and either misjudged the direction of the Petali or was not carefully watching his course. Having made an agreement to pass port to port he made the fatal error of suddenly changing his mind in the last few moments and deciding to pass starboard to starboard. He then sounded the two blast whistle which was not answered by the Petali. Without receiving a response from the Petali he proceeded to the west side of the channel directly in front of the Petali and on the side of the channel proper for the use of the Petali. He put his ship in front of the Petali while the Petali continued on its course, and the collision ensued. At the time this maneuver took place the vessels were only a few lengths apart. Having given the necessary signals to indicate a port to port passing, the pilot of the Bendita should not have changed his course to a starboard to starboard passing without receiving an indication from the Petali that she concurred in such change of course. If the pilot of the Bendita had continued on his starboard side of the channel, as he originally indicated he would, there would have been no collision and the passing could have taken place without incident. It was his sudden and improper change of course which put him in front of the Petali and made the collision inevitable.

There was some evidence that the Petali was not showing her green starboard light. This evidence was contradicted by those on the Petali who claimed that the

"Q. And why were you trying to get over to the left side of the channel? A. Because, if I'd stayed where I was, we would have had a collision.

"Q. And is it your testimony that after you made this decision the Petali suddenly ceased turning to the left and started turning to the right? A. She didn't suddenly start turning to the left and then to the right. She had apparently—it appeared to me that she was steady, and she was crossing over from port to starboard and was steady on that—whatever course he was steering. In other words, his range lights were cracked.

"The Court: Then, Captain, if that was so, why, the Petali was headed toward his port side, wasn't it?

"The Witness: That is correct, sir, yes, sir.

"The Court: And yet, when he struck you he struck you coming to starboard.

"The Witness: That's right, yes.

"The Court: Did he make a sudden shift of his direction?

"The Witness: Yes, sir. When I had a hard to port and full ahead, it was about three shiplengths when I decided to see if I couldn't get over to take—

this is when—if I'd of stayed where I was—

"The Court: If you had stayed where you were going when you gave it the hard to port and he had continued on the starboard course, you would have avoided each other; wouldn't you?

"The Witness: What was that again, your Honor?

"The Court: When you gave it hard left—

"The Witness: Yes.

"The Court: —and you had gone that way, and he had continued the way he was going—

"The Witness: We would have cleared nicely.

"The Court: —you would have cleared?

"The Witness: Very nicely.

"The Court: But you say at that particular moment the Petali reversed his course.

"The Witness: No, sir, it wasn't then. I had put my ship hard aport and full ahead, and just as she started swinging—I can't say in degrees; I'd say six, eight, ten degrees or something—after I had started swinging to port, then I noticed the Petali swinging to the starboard."

starboard light was showing at the time of the collision and was extinguished as a result of the impact of the collision. In any event, even if the starboard light was not showing at the time of the collision, this fact was not the proximate cause of the collision.

Having heard the witnesses and having examined the exhibits, the Court finds as a fact that the proximate cause of the collision was the failure of the Bendita to remain on its right side of the channel and its crossing over to the west side of the channel just moments before the crash, although it had indicated it was to make a port to port passing and although it had not received any indication from the Petali that she concurred in any change of plan to make a starboard to starboard passing.

## Discussion

Not alone had the Bendita violated the rules regulating speed in the Houston Ship Channel, but she also violated the so-called "narrow channel rule," Article 25 of the Inland Rules, 33 U.S. C.A. § 210. These rules are applicable to the Houston Ship Channel. City of Dallas, 1929 A.M.C. 1371 (S.D.Texas 1929).

Article 25 of the Inland Rules provides:

> "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The Bendita did not keep to its starboard side, but in the last few moments before the crash, veered over to its port side and put itself directly in front of the Petali. The Court cannot accept the argument that the Petali had been on the Bendita's side of the channel. This is contrary to the testimony of those who were on the Petali. Furthermore, it is inconsistent with the factual situation at the time of the impact. To accept the contention of the pilot of the Bendita we would have to assume that the Petali had been able to get over to the Bendita's

side of the channel and then back to her own side where the collision occurred, all within the distance of approximately 6 shiplengths, which was the distance between the two vessels when the pilot of the Bendita stated that he detected her altering her course to port. Such a rapid maneuver, which was denied by those on the Petali, would have been, in any event, almost an impossibility for a ship of its size.

A case somewhat similar to the present situation, involving a collision in the Houston Ship Channel on a clear night, when one vessel attempted moments before the collision to change its passing agreement, is that of The Gaston, 1929 A.M.C. 1205 (S.D.Texas 1929).

Judge Hutcheson, in his decision in this case, properly pointed out that

> "Navigation at night in narrow waters like the Houston Ship Channel requires brains and nerve and the exercise of all judgment and precaution, and it will not do for a ship which comes careening down the channel in the darkness of the night to by its speed cause a condition of emergency to arise, and then confront that emergency not boldly and with decision, but timidly and with vacillation."

## Conclusions

The Court therefore concludes that the cause of the collision was the improper and illegal navigation of the Bendita in proceeding at an excessive speed, in failing to keep to its proper side of the channel and in cutting across the bow of the Petali without receiving an agreement from the Petali to change the agreed port to port passing to a starboard to starboard passing.

The Court concludes that the whole responsibility for the collision is upon the Bendita. The libel of Elcarriers, Inc., as owner of the S/S Bendita, should be dismissed with costs and an interlocutory decree entered in favor of Maris Embiricos against the S/S Bendita, in rem, and against Elcarriers, Inc., in personam, for the amount of provable dam-

ages, with interest and costs. The issue of damages shall be referred to a Special Commissioner to hear and report to the Court thereon.

This opinion shall constitute the findings of fact and conclusions of law of the Court. Submit decree in accordance with the opinion.