**STATE OF LOUISIANA, ex rel. William J. GUSTE, Jr., Attorney General**

v.

**The M/V TESTBANK, etc., et als.**

**Civ. A. No. 80–2738.**

United States District Court,
E.D. Louisiana.

May 31, 1983.

John J. Broders, Joseph W. McKearn, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for State of La.

Thomas J. Grace, Theodore W. Brin, Courtenay, Forstall, Grace & Hebert, Walter J. Leger, Jr., Michael J. Mestayer, Leger & Mestayer, New Orleans, La., for plaintiffs committee representing fishermen etc.

Francis J. Barry, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiffs committee representing cargo claimants.

J. Dwight LeBlanc, Jr., Robert B. Fisher, Jr., Kenneth J. Servay, Chaffe, McCall, Phillips, Toler & Sarpy, Warren Faris, J.Y. Gilmore, Jr., John M. Kops, Faris, Ellis, Cutrone & Gilmore, New Orleans, La., Courtney Wilder Statnton (of counsel), Jacksonville, Fla., for M/V Testbank.

Walter Carroll, Jr., Hugh Ramsey Straub, Jean Melancon, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for Fortune Sea Transp. Corp.

Donald R. Abaunza, Robert W. Booksh, Jr., Liskow & Lewis, New Orleans, La., for Bank Line Ltd.

Maurice C. Hebert, Jr., George M. Legrande, Hebert & Abbott, C. Michael Winters, New Orleans, La., for Katy Stevedores.

H.F. Foster, III, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for Vulcan Materials Co.

John Poitevent, Poitevent & Acomb, New Orleans, La., for Dresser Minerals.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

This matter arises out of a collision between the M/V TESTBANK and the M/V SEADANIEL which occurred in the Mississippi River Gulf Outlet on July 22, 1980. As a result of the collision, certain cargo aboard the TESTBANK, including the chemical pentachlorophenol (PCP), was discharged into the Mississippi River Gulf Outlet. For a brief period following this spill, the waterway was closed to vessel traffic and to fishermen.

These events spawned much litigation including cargo claims, the claims of a number of oystermen, shrimpers, crabers, and fishermen, the claim of the Coast Guard for expenses incurred in the clean-up, the claim of the State of Louisiana for expenses it incurred, the petitions of the two vessel owners to limit their liability, and the claims of others asserting losses as a result of the closing of the Mississippi River Gulf Outlet. There is also one Jones Act claim. The right of the vessels to limit their liability to the amount of the limitation bonds plus accrued interest has been stipulated. The Coast Guard's claim has been settled. The claims of those asserting losses as a result of the closing of the waterway, other than the claims of the oystermen and fishermen, have been dismissed on this court's motion docket. As to the remaining claims, the trial of liability was severed from that of damages. Liability was tried to the court without jury and the matter was taken under submission. The parties were given a briefing schedule with the last briefs due by April 20, 1983. After considering the evidence and the applicable law, I have reached the following findings of fact and conclusions of law. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Partenreederei M/S CHARLOTTA was at all material times, the owner of the TESTBANK, an ocean-going container vessel registered in the Federal Republic of Germany.

2. The Bank Line Limited, a shipping company organized under the laws of the United Kingdom, was at all material times the time charterer of the TESTBANK.

3. Fortune Sea Transport Corporation Panama, S.A., was at all material times the owner and operator of the SEADANIEL, an ocean-going dry cargo vessel registered in the Republic of Panama.

4. Vulcan Materials, Inc., was the manufacturer and packager of the PCP carried aboard the TESTBANK.

5. Nichimen of Canada, Ltd., was the consignor of PCP carried aboard the TESTBANK. Societe Xylochimie, S.A., was the consignee of the PCP cargo. Societe Xylochimie was dismissed by the court for lack of personal jurisdiction. Nichimen did not make an appearance at the trial of this matter though it is named as party defendant in certain of the claims involved

herein. No party raised the issue of the absence of Nichimen from these proceedings. The court concludes that any claims against Nichimen are mooted by lack of prosecution.

6. Katy Stevedores loaded the PCP cargo in Houston in accordance with a prestow plan provided by Bank Line. Katy was dismissed at the trial.

7. The TESTBANK, a modern three-hold container ship built in 1978, is diesel powered and is equipped with a single right hand propellor. Her bridge, accommodations and machinery are aft, with two large cargo masts forward. She is 495 feet in length, 69 feet in breadth and her tonnages are 5,629 gross, 4,064 net, and 12,914 deadweight. Court Exhibit 1. The bow and forebody of the TESTBANK were especially strengthened for ice.

8. Captain Wilfred Simmat, master of TESTBANK on the date of the casualty, testified that TESTBANK's engine room is fully automated and is bridge controlled. Her bridge control feature allows her Master or Watch Officer to select any desired engine RPM which is transmitted to the engine directly from the bridge.

9. The SEADANIEL, a six-hold bulk carrier built in 1976, is diesel powered, with a single screw. Her bridge, accommodations and machinery are aft. She is 580 feet in length, 75 feet in breadth, and her tonnages are 16,168 gross, 10,998 net and 27,000 deadweight. Court Exhibit 1. At the time of collision, the SEADANIEL was carrying barite in bulk.

10. The SEADANIEL's engine is controlled in the conventional manner: an engine order telegraph located on the bridge is used to transmit bells to the engine room and the engine room watch personnel answer the bell and change the engine speed from the engine room control station.

11. These two vessels came into collision on July 22, 1980, near Shell Beach, in a straight reach of the man-made ship channel called the Mississippi River Gulf Outlet (MRGO or "Mister Go"). This reach, approximately five and one-half statute miles long, is marked by beacons 95 and 96 at the lower, or seaward, end and beacons 103 and 104 at the upper end. The reach proceeds on a 108°–288° true axis, the latter being the base course for inbound vessels.

12. Due to the flat, marshy terrain surrounding the MRGO and the virtual absence of shore structures, visibility on the ship channel is impaired only by weather conditions and nightfall. All parties present on the day of the collision testified that visibility was unimpaired by weather on that date. There was a slight variable wind. The current, running to sea, was also slight. The vessels first sighted each other at dusk. The collision occurred shortly after dark.

13. On the afternoon of July 22, 1980, the TESTBANK completed cargo handling operations at the France Road container terminal and her officers and crew made preparations to get under way. Tests of the vessel's main engine, engine control system and steering gear were conducted and all systems were found to be operating normally. At approximately 1800 hours river pilot Douglas J. Grubbs boarded the TESTBANK to take her outbound to the Gulf of Mexico via the MRGO. When Pilot Grubbs boarded the vessel and met her Master, they discussed the amount of time it took to start and stop engines, to go astern, and the number of revolutions that could be generated. The two did not discuss the time and distance which TESTBANK would require to stop, Pilot Grubbs explaining that the values usually given are inapplicable in shallow waters. Pilot Grubbs had never piloted the TESTBANK before but had piloted sister ships of the TESTBANK. Pilot Grubbs knew that he would meet the SEADANIEL in his passage, but before getting underway, he did not know the type of ship he would meet, nor where the two vessels would pass. The TESTBANK's departure draft, according to Pilot Grubbs, was approximately 27 feet even keel. At 1836 hours the TESTBANK sailed, her intended destination various northern European ports.

14. The Master of the TESTBANK, Captain Wilfred Simmat, held a Master's License for ocean going vessels of unlimited tonnage issued by the Federal Republic of Germany since 1964. Captain Simmat was generally familiar with the MRGO, having made nine trips with the TESTBANK on the MRGO before the collision voyage.

15. In addition to Pilot Grubbs, the following personnel were on the bridge of the TESTBANK when she sailed: her Master, Captain Simmat; her Chief Officer, who remained on the bridge until 2000 hours; apprentice Michael Simmat,[A] her helmsman; and a seaman who was stationed on

A. The captain's son.

the bridge wings, acting as lookout. The TESTBANK's engine speed was controlled directly from the automated bridge by the Master, who was operating the engine control lever in response to the engine orders of Pilot Grubbs.

16. The initial part of the transit was uneventful, with the TESTBANK passing a tow port-to-port or on "one whistle." According to Pilot Grubbs, the TESTBANK had "excellent handling characteristics" and he did not experience any problems with the steering of the vessel. Additionally, the helmsman, Michael Simmat, testified that he had no problems keeping the vessel on course.

17. As the TESTBANK was approaching beacons 103 and 104 on a 119° true course setting, her navigators first sighted the lights of the SEADANIEL, which at that time was below beacons 95 and 96. Pilot Grubbs also sighted a number of fishing boats ahead of the TESTBANK in the vicinity of Shell Beach and reduced speed to half ahead at about 2030 hours. At about the same time, TESTBANK changed course to 108° true, entering the Shell Beach reach. According to Pilot Grubbs, she was then in the middle of the channel, slightly favoring the south side.

18. When the TESTBANK was abeam of a pipeline above Shell Beach, Pilot Grubbs brought her right to 110° true, and thereafter continued outbound, paralleling the south bank just off the centerline, favoring the south shore. He called Pilot Clement B. Hingle, who was aboard the approaching SEADANIEL on VHF Channel 67 and the two pilots agreed to meet and pass port-to-port. Pilot Grubbs explained that the customary procedure for accomplishing a one whistle passing of two deep draft vessels is for both vessels to stay on the centerline until the vessels are approximately one-quarter of a mile apart, at which point each vessel would turn to its respective right side to accomplish the passage. In this particular case, however, after Pilot Hingle told Pilot Grubbs that he had a load, Pilot Grubbs, who explained that he felt he had a ship that handled very well, agreed to stay out of the way of the SEADANIEL, i.e., to give the SEADANIEL more of the channel. I find that this was the intention of the two pilots in how the passage was to be accomplished.

19. The TESTBANK continued to reduce speed, coming to dead slow ahead, at 2036 hours in preparation for meeting SEADANIEL. A little below Shell Beach in the vicinity of Bayou Yscloskey, Pilot Grubbs effected a course change to 112° true and steadied up parallel to the south shore. While cross-examination revealed that Pilot Grubbs never expressly stated to the helmsman to change from course 110° to course 112°, Grubbs explained that the course change was effected by the Pilot actually steering the vessel, not physically, but by giving the helmsman specific rudder commands. The explanation is credible and the court finds such to have been the case.

20. At this time, those on the bridge of the TESTBANK testified that the vessel was approximately 200 feet off the visible bankline on the south shore. While this was seriously disputed by a tug pilot in the vicinity and those on the bridge of the SEADANIEL, with the exception of Pilot Hingle, for the reasons expressed below, I find that the TESTBANK was favoring the southshore in the vicinity of Shell Beach/Bayou Yscloskey.

21. At Shell Beach, the TESTBANK blew one whistle which was answered by the SEADANIEL.

22. The SEADANIEL had arrived at the South Pass Pilot Station at about 1355 hours on July 22, at which time a Bar Pilot boarded to take the vessel into the MRGO. Her freshwater arrival draft was 31 feet 08 inches, even keel. At 1931 hours, when the SEADANIEL was in the vicinity of beacon 78, the Bar Pilot was relieved by River Pilot Clement B. Hingle, now deceased.

23. The SEADANIEL's Master, Captain Tien Yung Kwang, held licenses issued by the countries of Liberia, Panama and Somalia. Captain Tien had never previously transited the MRGO.

24. In addition to Pilot Hingle, the following personnel were on the bridge of the SEADANIEL during the relevant time periods: the Master, Captain Tien, a third mate, Au Yeung Yuk Yam, a quartermaster on standby acting as a lookout, and a quartermaster acting as helmsman, Chau Chi Keung.

25. Prior to the pilot change, SEADANIEL met and passed an ocean-going cargo vessel. Following the departure of the bar pilot, SEADANIEL proceeded inbound on the MRGO at full ahead sea speed, and in the vicinity of beacon 80, met and passed an outbound ocean-going cargo vessel without incident.

26. After sighting the outbound TESTBANK and agreeing with Pilot Grubbs to a port-to-port or one whistle passing, Pilot Hingle contacted the inbound tow MANDY CENAC which was proceeding ahead of SEADANIEL in the vicinity of beacons 95 and 96. Hingle and the operator of the MANDY CENAC made a one whistle overtaking agreement, and SEADANIEL thereafter overtook the MANDY CENAC, passing the MANDY CENAC's starboard side without any problems. The MANDY CENAC was being piloted by A.J. Dempster.

27. Mr. Chau, who was unavailable for trial, testified at the Coast Guard Board of Inquiry that he had experienced some difficulty during the passage in maintaining his course. He explained that the vessel tended to turn to the starboard side and that some degree of port rudder was needed to stay a given course. SEADANIEL Exhibit 16, p. 11, 36–40. All testimony essentially confirms that as the vessels were closing on each other in the Shell Beach reach of the MRGO, the SEADANIEL began to make a slight turn to her right or north bank side of the channel. Captain Simmat and Pilot Grubbs noted this slight starboard shift in the range lights of the SEADANIEL. All testimony from those on the bridge of the SEADANIEL confirms that this was due to the fact that after overtaking the MANDY CENAC, Pilot Hingle brought SEADANIEL to course 290° true and shortly thereafter noticed that his quartermaster had gotten off course with the ship's head between 293.5° and 294°. At that point, Hingle instructed the quartermaster and the watch officer to pay attention and to bring the ship back to the ordered course of 290°.

■ 28. It is at this point that the testimony becomes completely irreconcilable. In such cases, the court is obliged to make credibility decisions based on its observance of the witnesses and on its common sense impression of the reasonableness of the various versions of the event. The first conflict concerns the lateral position of the TESTBANK in the MRGO. Those on the bridge of the TESTBANK and Pilot Hingle place the TESTBANK on the south bank side of the centerline of the channel. Those on the bridge of the SEADANIEL, other than Pilot Hingle, place the TESTBANK on the centerline, or according to Captain Tien slightly to the northern side of the centerline of the channel.

29. The testimony of Dempster, the tug pilot on the tug MANDY CENAC which the SEADANIEL had just passed, was to the effect that the TESTBANK was on the north side of the channel. This latter description of the event by a disinterested third party would ordinarily be entitled to great weight. The court, however, does not find Dempster's testimony credible for a number of reasons. First, his testimony in court was confusing and at times inconsistent. Second, his testimony in court was wholly inconsistent with his testimony at the Marine Board of Inquiry. Third, Dempster placed his tug and the SEADANIEL only 50–60 feet off the visible north bankline, a position outside the navigable channel in which a vessel with a draft of nearly 32 feet would have grounded. Finally, at trial, Dempster admitted that he could not see the bank on both sides due to darkness.

30. I also am obliged to conclude that Captain Tien's testimony about the position of the TESTBANK is not credible. First, Captain Tien was impeached on cross-examination as to other navigational points discussed below. Second, it is less than credible that a pilot who knows that an approaching ship is loaded and who has

agreed to stay out of the way to an even greater extent than is generally customary would remain at mid-channel. It is far less credible that such a pilot would encroach on the wrong side of the channel as the ships were making up for passage. Furthermore, throughout the communications between the pilots, Pilot Hingle never complained to Pilot Grubbs about the position of the TESTBANK.

31. I find that as the TESTBANK and SEADANIEL continued to close on each other, they were aligned for a normal port-to-port passing. The TESTBANK was on her own side of the channel favoring the south bank.

32. The other major factual dispute concerns exactly what transpired on the bridge of the SEADANIEL after Pilot Hingle noticed the SEADANIEL was slightly off course. After Pilot Grubbs noticed the SEADANIEL's slight starboard turn, at approximately 2042, or two minutes before the collision, Pilot Grubbs received a call from Pilot Hingle on Channel 67 who informed him, "Doug, these people are hard headed. They won't listen. I told them to steer a course and they are steering 5° past what I told them. I'm going to have to bring her back out."[1] Following that transmission Grubbs noticed the range lights of SEADANIEL move back to port, indicating to Grubbs that Hingle had corrected his helmsman. At that time the two vessels were no more than a quarter mile apart and still properly aligned for the port-to-port passing. According to Grubbs and Hingle, had SEADANIEL remained in shape, the two vessels would have cleared each other safely. When the two vessels were less than a quarter of a mile or approximately three ship lengths apart, and a minute or less before collision, Grubbs received what I would have to describe as a rather frantic call from Hingle on Channel 67, at 2043, one minute before collision, shouting "Doug, they've put the wheel hard to port." Following that transmission, Cap-

tain Simmat, Pilot Grubbs and helmsman Michael Simmat testified that they observed the SEADANIEL in a port turn, coming across the centerline of the channel toward the TESTBANK.

33. The events that preceded the SEADANIEL's swing to her port that gave rise to the foregoing radio transmissions were described in detail by Pilot Hingle, in his Coast Guard testimony. In the process of bringing SEADANIEL back to 290°, Hingle noticed that his ship's head was drifting too fast to port and ordered starboard helm to check the port swing. SEADANIEL did not respond and Hingle ordered hard starboard to check the swing to port which had become more pronounced. As the swing rapidly increased to port, Hingle testified that he then noticed that the rudder angle indicator was in the hard port rather than hard starboard position he had ordered. It was at that time he warned Pilot Grubbs on VHF that the wheel of the SEADANIEL was hard to port, with his ship "swinging out of control." He again ordered hard starboard and motioned to the right, his hands touching the wheel. All of this is essentially confirmed by those on the bridge of the SEADANIEL with the significant exception that Captain Tien and Messrs. Chau and Au deny that the rudder angle indicator was ever fully at port. They testify that at most the helmsman applied 10–15° of port rudder to come back to the 290° course. While the court had only the benefit of deposition testimony of Messrs. Chau and Au, effective cross-examination of Captain Tien indicated that he was not in a position to see the rudder angle indicator, and given the exigency of the moment, I find that he probably did not move into a position to see it. Furthermore, for the very reasons that excited utterances and present sense impressions are allowed as exceptions to the hearsay rule, I find that Pilot Hingle's exclamation to Pilot Grubbs provides the most credible evidence that the rudder had been placed hard to port.

---

**1.** While the copy of the VTS tape and its Coast Guard transcription, USCG Exhibits 3 & 3A, is in some sense no more than the opinion of the transcriber as to who is speaking, all of the relevant communications were essentially confirmed by the testimony of Pilot Grubbs.

34. According to Captain Simmat and Pilot Grubbs, it was less than a minute from the time of noticing SEADANIEL's port swing to the time of collision. After seeing SEADANIEL starting to swing to her port across the centerline of the channel, Grubbs ordered "stop engine," blew the danger signal, ordered the helm of the TESTBANK hard starboard, followed by the order "full astern." However, collision could not be avoided and at 2044, according to the logs of both vessels, SEADANIEL struck TESTBANK in the vicinity of her port bow, thereafter raking down TESTBANK's port side. As a result of the collision, several of the TESTBANK's cargo containers fell overboard, and the hull of the TESTBANK was holed. A number of containers aboard the TESTBANK were damaged or crushed due to the force of the impact.

35. At the time of impact, TESTBANK was about 150–200 feet off the south bank of the channel. Her automatic bell recorder shows that her engine was placed astern at 2043:40 and her engine was stopped at 2044:30 just following collision. Collision occurred at approximately Mile 40.9, below Shell Beach, on TESTBANK's side of the channel.

36. Virtually all witnesses, including Dempster, confirm that it was the SEADANIEL who "angled" into the TESTBANK. Expert naval architects testified on behalf of both vessels at trial concerning the angle of blow or impact between the two vessels. Naval architect Arthur Darden, Jr., on behalf of TESTBANK, testified that in his opinion the angle of blow, measured relative to the centerline of each vessel, was in the vicinity of 25 to 30 degrees, and possibly closer to 25 degrees. Arthur Sargent, called by SEADANIEL's interests as an expert naval architect, testified that the angle was 18 to 19 degrees. Both of these experts admitted their prediction of the angle of impact is not an exact science. Taking into consideration the testimony of the various fact witnesses, which testimony is consistent with the fact that the SEADANIEL made a definite port turn, at an angle, into the port side of the TEST-

BANK, and the experts on angle of blow, the court finds the angle of impact was approximately 25°.

37. Notwithstanding USCG Exhibit # 66, I find from the testimony of Captain Arnoult that at the time of the collision, the Crescent River Port Pilots Association had no rules or restrictions in effect that would have prohibited TESTBANK and SEADANIEL from meeting and passing each other in the MRGO. Additionally, the Crescent River Port Pilots had not, at that time, adopted, and have never since adopted, any formula developed by Dr. John Herbich, of Texas A & M University, for use in determination of vessel traffic separation in the MRGO. Dr. Herbich did testify that as an expert his opinion was that the channel was too narrow to accommodate the passage of two vessels with the dimensions of the SEADANIEL and TESTBANK. There is, however, no credible evidence that the configuration of the bank or bottom of the channel had any effect in causing this collision. The sole cause of the collision appears to have been a helmsman who, when off course, overcompensated to correct his heading and applied a hard port rudder rather than starboard as ordered, and I so find.

38. Because the collision resulted in a chemical spill in the MRGO, certain aspects of the stowage of cargo aboard the TESTBANK have been placed at issue. The TESTBANK is a multipurpose, general cargo container ship. The containers are loaded or arranged in stacks in the vessel's three cargo holds and on deck in stacks on top of her three hatches. On the collision voyage, she carried 40-foot and 20-foot general cargo container units stowed below and above decks, which cargo was loaded in Houston and New Orleans.

39. The TESTBANK's Houston cargo was loaded by Katy Stevedores in Houston in July, 1980, in accordance with a pre-stow plan prepared by Bank Line Port Captain Shaw. Included among the TESTBANK's general cargo were six containers of pentachlorophenol, a common wood preservative.

The PCP was listed on the vessel's "dangerous cargo manifest."

40. According to the testimony of Mr. Kenneth Jarrett, whom the court accepted as an expert chemist with experience in the area of packaging dangerous substances, PCP is a toxic substance often used in the paper industry. In comparing PCP to other dangerous cargos listed in the International Marine Dangerous Goods Code (IMDG Code)[2] of the Inter-Governmental Maritime Consultative Organization, Jarrett described PCP as the least toxic substance. Although there was some evidence introduced by deposition as to the potential risks of PCP to marine life, Plaintiff's Exhibit 7, pp. 32, 59–60, the only evidence introduced concerning the actual effects in the instant case upon the marine life in the surrounding area was the testimony of Jarrett. Jarrett attended the M/V TESTBANK after the collision. In addition, he collaborated with the Regional Response Team, received data that they developed and was involved in the discussions of what course of action to take. Although the Coast Guard and other governmental officials certainly acted prudently in closing the MRGO and surrounding waters to determine if there were any hazards presented as a result of the collision and spill, it was Jarrett's opinion, after reviewing all of the available evidence, that the hazard to aquatic life was "substantially overstated" and that the spill did very little harm to aquatic life.

41. The PCP carried by the TESTBANK at the time of the casualty consisted of 100 metric tons loaded into six 20-foot containers. It was manufactured and packaged by Vulcan Materials Company of Birmingham, Alabama, for sale to Nichimen of Canada, Ltd., who sold it to a European customer, for discharge in LeHavre, France. The six containers were loaded on deck, in an outboard position. Thereafter, all of the on deck containers were secured in place with cable lashings and locking mechanisms. It is my firm belief that the container of PCP did not fall overboard due to any improper securing of the containers. The lashings were adequate to withstand the normal rigors of sea transportation.

42. The PCP was manufactured and packaged in Vulcan's Wichita, Kansas plant. As requested by the shipper, Nichimen, the PCP was packaged in 4-ply, 50-lb. paper sacks which were stacked on wooden pallets. Thereafter each loaded pallet was wrapped with plastic and the pallets were loaded into the 20 foot steel containers which were then sealed for "house-to-house" shipment. Each container held approximately 18 tons of PCP. There was no placard or markings on the outside of the 20 foot containers. Bank Line did not open the containers to check the packaging, it being customary in the industry to assume that containerized cargo shipped house to house is properly packaged by the shipper.

43. Captain Simmat testified that he preferred to stow dangerous cargo, such as PCP, on deck, outboard, especially for crew and cargo safety reasons. Additionally, expert chemist Kenneth Jarrett of London demonstrated that above deck stowage was the only reasonable location to store PCP, since below deck stowage would result in the possibility of not only tainting other cargo stowed in the same hold, but might also result in contamination of the hold itself. Captain Michael Ward of the Bank Line, Limited, and Captain Juergen Manske of Hapag-Lloyd Lines also testified that on deck stowage, outboard, was preferable for a cargo such as PCP because leaks are more readily apparent and more easily washed away. The expert testimony conclusively established that the stowage of the PCP aboard the TESTBANK was undertaken with due consideration of the crew and cargo and was in conformance with existing customs in the industry. Port rotation was

---

2. Jarrett explained that the origin of the IMDG Code was the Safety of Life at Sea Convention, a body whose purpose was to put together a code to protect the crew of vessels at sea, as well as the safety of cargos. Nothing in the IMDG Code is directed to a consideration of environmental concerns. Jarrett stated that while certain packaging requirements in the IMDG Code may incidentally protect against environmental contamination, that was not the interest that was sought to be protected by promulgation of the Code.

also a consideration in the stowage of all cargo. The contrary testimony of Mr. Robinson was deemed not credible by the court. Mr. Robinson was not qualified as an expert with regard to shipboard stowage operations. Furthermore, his opinion testimony was substantially discredited on cross-examination indicating that his own employer did not adhere to the practices suggested by Mr. Robinson. Bank Line Exhibits 2–8.

## Conclusions of Law

1. This court has jurisdiction over this admiralty action pursuant to 28 U.S.C. § 1333 and venue is proper.

2. The conduct of the parties to this collision, which occurred on the MRGO, is governed by the Rules of the Road for Inland Waters, 33 U.S.C. §§ 151–232 (Inland Rules), and the Pilot Rules for Inland Waters, 33 C.F.R. §§ 80.01–.45 (1979) (Pilot Rules).

3. Particularly applicable is the "Narrow Channel Rule," Article 25 of the Inland Rules, which requires vessels in a narrow waterway to keep to their own righthand side of the channel. 33 U.S.C. § 210. The same principle is set forth in the Pilot Rules. *See* 33 C.F.R. § 80.10 (1979).

 4. Violation of the Rules raises a presumption of negligence against the violator. In order to rebut the presumption, the party against whom the presumption is invoked must prove not only that such fault probably did not, but that it could not have contributed to causing the collision. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874); *Atlantic Mutual Insurance Co. v. ABC Insurance Co.,* 645 F.2d 528, 531 (5th Cir.1981). It does *not,* however, require a showing that such "fault could not, by any stretch of the imagination, have had a causal relation to the collision." *China Union Lines, Ltd. v. A.O. Andersen & Co.,* 364 F.2d 769, 782 (5th Cir. 1966), *cert. denied,* 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967).

 5. Vessels crossing the centerline at the last moment in a narrow channel are at fault and are responsible for the damages resulting therefrom. *E.g., United States v. Smith,* 168 F.2d 43 (5th Cir.1948); *Philtankers, Inc. v. M/V DON CARLOS,* 526 F.Supp. 34, 41–42 (S.D.Tex.1981); *Indian Towing Co. v. Tug WESLEY W.,* 264 F.Supp. 892 (E.D.La.1967); *Peed v. The JESSIE J.,* 191 F.Supp. 618 (E.D.La.1961); *Elcarriers, Inc. v. Embiricos,* 174 F.Supp. 929 (S.D.N.Y.1959).

 6. The court concludes that the sole proximate cause of the collision was the breach of the Narrow Channel Rule by the SEADANIEL when her helmsman applied an improper hard port rudder, causing the SEADANIEL to cross the centerline of the MRGO. In their brief, the SEADANIEL interests attempt to invoke the *Pennsylvania* rule against the TESTBANK for certain alleged violations of the "Good Seamanship Rule," Article 29 of the Inland Rules, 33 U.S.C. § 221, *e.g.,* (1) using an apprentice helmsman, (2) allowing the deck watch officer to leave the bridge (notwithstanding the fact that the TESTBANK's bridge is fully automated and had been issued a third mate exemption, USCG Exhibit 65), (3) proceeding through the channel notwithstanding awareness of SEADANIEL's steering difficulties, and for the breach of certain more specific regulations, *e.g.,* (4) the pilot being unaware of the time and distance to stop the vessel, and (5) the lack of a crew member stationed at the fo'c'sle to drop anchor. I conclude that the third and fourth alleged violations cited above are not supported by the record. Even assuming, for the sake of argument, the propriety of invoking the *Pennsylvania* rule with regard to the first and second alleged violations,[3] I conclude that the three remaining allegations of statutory fault do not provide the basis for imposing liability on the TESTBANK interests in that it is clear on the entire record as now constituted that such fault could not possibly have been the cause

---

3. The *Pennsylvania* rule in its inception was meant to apply to statutory fault. Applying the presumption to the "due care" standard of Article 29 would result in "making all negligence statutory fault." G. Gilmore & C. Black, *The Law of Admiralty* 497 (2d ed. 1975).

of this collision. The SEADANIEL, however, has failed to meet her burden of showing that her statutory fault was not a cause of the accident. Consequently, the court finds that the responsibility for this collision lies solely with the SEADANIEL, which was navigated in an inattentive, negligent manner in allowing the vessel to go to port and that this negligent navigation caused the collision.

7. With regard to the liability of the TESTBANK, the Bank Line, and Vulcan, for the packaging and stowage of the PCP cargo, I note that there were no binding United States statutes or regulations governing the carriage of PCP which were in effect on the date of the collision, July 22, 1980. 49 C.F.R. §§ 171.1, .8, 172.101 (1979). Accordingly, the court has found no statutory or regulatory violation from which any presumption of fault arises with respect to the stowage of PCP aboard the M/V TESTBANK.

The SEADANIEL interests maintain that because TESTBANK chose to comply with the compulsory provisions of United States' regulations through the option of compliance with the IMDG Code, the IMDG Code in its entirety became mandatory, even if, as here, the IMDG Code covered substances not regulated by federal law. Noncompliance with the IMDG Code would then constitute violation of a standard of care imposed by law, thus invoking the *Pennsylvania* rule. The argument is flawed in two respects. First, there is nothing in the federal regulatory scheme that indicates optional compliance with the IMDG Code in the transportation of regulated substances which makes compliance with the IMDG Code mandatory as to nonregulated substances such as PCP. 49 C.F.R. 172.102 (1979). Second, the court acknowledges that the *Pennsylvania* rule has been applied in noncollision contexts, *Candies Towing Co. v. M/V B & C ESERMAN,* 673 F.2d 91 (5th Cir.1982), "but in such cases at least seems not to apply unless the catastrophe that ensues is one sought to be prevented by the statutory rule." G. Gilmore & C. Black, *The Law of Admiralty* 494 n. 49 (2d ed.

1975). This is in accord with traditional land-based negligence per se principles, which require a plaintiff who attempts to prove that violation of a statute constitutes breach of the relevant standard of care make a showing (1) that he is a member of the class for whose benefit the statute was enacted, and (2) that the harm suffered is of the kind that the statute was intended to prevent. W. Prosser, *Handbook of the Law of Torts* § 36, at 192–97 (4th ed. 1971). It is undisputed in this record that the IMDG Code was drafted to protect cargo and life at sea, not the environmental interests represented by the various plaintiff fishermen, parties to this litigation.

I conclude, therefore, that the burden of proving that packaging and stowage deficiencies provide a basis for imposing liability on parties other than the SEADANIEL interests lies upon those who urge the liability of the TESTBANK, the Bank Line, and Vulcan, in accord with traditional burden of proof principles.

8. For this court to impose such liability in the face of compliance with a detailed United States regulatory scheme is a difficult, indeed, maybe unwarranted, exercise of the judicial function. It was, perhaps, a recognition of the limitations of the judiciary and its ability to deal with such highly technical matters that prompted the Fifth Circuit, in *China Union Lines,* 364 F.2d at 784–86, to note that regulations governing the carriage of dangerous substances set forth the standard of care to which a carrier is held. More importantly, the court seemed to indicate that a carrier has no duty, particularly with regard to the positioning of the cargo aboard his vessel, which is not imposed by the statute or regulation governing such carriage. *Id.* While I find such a rule compelling in complex cases such as this, out of an abundance of caution, I proceed to a consideration of whether the shippers and carriers breached the duty of reasonable care under the circumstances.

9. There were two nonmandatory regulations or guidelines in existence on the date of collision which, it is argued, set

forth the standard in the industry and, therefore, constitute the appropriate standard of care. The IMDG Code listed PCP as a Class III hazardous material. The IMDG recommendation for the carriage of PCP was that it be carried on deck or under deck. USCG Exhibit 25. There was and presently is no specific recommendation in the IMDG Code concerning where on deck the cargo should be carried. Also, the Department of Transportation (DOT), in the May 22, 1980, edition of the Federal Register, 45 Fed.Reg. 34,560 (1980), published amendments to its regulations governing the carriage of dangerous substances. These amendments included PCP as a regulated substance; however, the effective mandatory date of these regulations was in November 1980, several months after the collision in question. Like the IMDG Code, the applicable DOT regulations merely provide that the stowage of PCP is proper on deck or under deck. 49 C.F.R. § 172.101 (1980). The DOT regulations, like the IMDG Code, specify no particular position on or under deck where the PCP cargo is required to be carried.

10. While expressing no opinion as to the correctness of using these advisory guidelines as the appropriate standard of conduct, I conclude that at least as to the location on the TESTBANK where the PCP was stowed, it was, in fact, stowed in accordance with such guidelines. I so conclude after full consideration of the general statements contained in those guidelines concerning on deck versus under deck stowage. 49 C.F.R. § 172.101(i)(1) (1980); IMDG Code § 14.3.

11. It does appear, however, that the packaging of the PCP did not comply with the IMDG Code in three respects: (1) when paper bags are used, a lesser amount of PCP should be packed in each bag than was done here, (2) when paper bags are used, a wooden or fiberboard box should be used to enclose the bags, and (3) a placard stating "HARMFUL" should have been placed on the outside of the container.

■ 12. These technical violations, however, played no substantial causative role in the environmental pollution that occurred. *Chavez v. Noble Drilling Corp.,* 567 F.2d 287 (5th Cir.1978); *Watz v. Zapata Off-shore Co.,* 431 F.2d 100, 115–16 (5th Cir.1970). Mr. Jarrett testified that given the crushing and mangling of the containers due to the collision, the additional packaging requirements would not have prevented the PCP from being spilled just as it was in the instant case. Similarly, the lack of the placard on the PCP containers was of no significance because the Bank Line, who prepared the stow plan, chose the outboard, on-deck location with full knowledge of what the cargo was.[4]

13. Apart from alleged violations of pertinent regulations or industry customs, the SEADANIEL interests and the plaintiffs have argued that the stowage of PCP on deck was not prudent and reasonable under the circumstances. In this regard, I note that "The culpability of the actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward 'with the wisdom born of the event.'" W. Prosser, *Handbook of the Law of Torts* § 31, at 146 (4th ed. 1971) (quoting *Greene v. Sibley, Lindsay & Curr Co.,* 257 N.Y. 190, 177 N.E. 416 (1931) (Cardozo, C.J.)). The following classic statement of law of negligence is pertinent to the present inquiry:

> Since there are occasions when every vessel will break away from her moorings, and, since, if she does, she becomes a menace to those about her, the owner's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions. Possibly it serves to bring this notion into relief to state it in algebraic

---

**4.** It is for the same reason, lack of legal causation, that the plaintiffs' products liability con-

tentions against Vulcan must fail.

terms: if the probability be called P; the injury L; and the burden B; liability depends upon whether B is less than L multiplied by P; i.e., whether B is less than PL.

*United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2d Cir.1947).

14. Here, notwithstanding the deposition testimony of the possible effects of PCP on aquatic life, Mr. Jarrett testified that the effect was minimal. Furthermore, PCP is recognized as one of the least toxic regulated substances. Hence, the value ascribed to the possible injury in the above equation must be considered small. Also, while collisions, of course, do occur, collisions which result in spills must be considered relatively infrequent occurrences. On the other side of the equation, three master mariners and a chemist testified that shifting such cargoes below deck or in board can present significant risks to the health and life of the crew, as well as taint other cargos. These factors form the basis for a conclusion that there was no substandard conduct in the packaging and stowage of the PCP cargo. Furthermore, the claim that below deck stowage is safer than on deck stowage comes only "with the wisdom born of the event." If, for instance, the TESTBANK had sunk, retrieval of PCP stowed below deck would have been far more difficult.

15. For these reasons, I conclude that the TESTBANK interests, the Bank Line, and Vulcan are without fault in the damages that resulted from this collision. As stated above, the sole cause of the collision, and thus all resulting damage, was the negligent navigation of the SEADANIEL.

Counsel for the TESTBANK interests, the Bank Line, Ltd., Vulcan Materials and the plaintiffs shall submit judgments consistent with this opinion.